# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|                                   |   |              |
|-----------------------------------|---|--------------|
| **TAMARA FARMER,**                | ) |              |
|                                   | ) |              |
| **Plaintiff,**                    | ) |              |
|                                   | ) | **CIVIL ACTION** |
| **v.**                            | ) |              |
|                                   | ) | **No. 09-2505-JWL** |
|                                   | ) |              |
| **MICHAEL J. ASTRUE,**            | ) |              |
| **Commissioner of Social Security,** | ) |           |
|                                   | ) |              |
| **Defendant.**                    | ) |              |
| _____ | ) |             |

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security
(hereinafter Commissioner) denying disability insurance benefits (DIB) and supplemental
security income (SSI) under sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Social
Security Act. 42 U.S.C. §§ 416(i), 423, 1381a, and 1382c(a)(3)(A) (hereinafter the Act).
Finding the ALJ erred in weighing the medical opinions of many treating health care
providers; and finding the administrative record has been fully developed and substantial
and uncontradicted evidence on the record as a whole indicates that Plaintiff is disabled
and entitled to benefits; the court exercises its discretion to REVERSE the
Commissioner's decision and enter judgment in accordance with the fourth sentence of 42

U.S.C. § 405(g) REMANDING this case to the Commissioner for an immediate award of benefits.

## I.    Background

Plaintiff protectively applied for DIB and SSI on March 8, 2004,[1] alleging disability since December 31, 1999.[2] (R. 16 I, 120-22, 1953-55). Her applications were denied, and Plaintiff requested a hearing before an administrative law judge (ALJ). (R. 16 I, 17 A-20, 58-59). Plaintiff's request was granted, and Plaintiff appeared with counsel for a hearing before ALJ Guy E. Taylor on September 27, 2007. (R. 1958-2001). Subsequently, the ALJ issued a decision denying the applications, which Plaintiff appealed; and the Appeals Council reviewed, vacated the decision, and remanded for further proceedings. (R. 16 I, 25-38, 76-78, 40-42). ALJ Taylor held a supplemental hearing on remand, at which Plaintiff appeared, represented by counsel. (R. 16 I, 2001-35). At the hearing, testimony was taken from Plaintiff, from Plaintiff's mother, and from a vocational expert. Id. On July 2, 2009, the ALJ issued another decision, finding Plaintiff is not disabled within the meaning of the Act, and denying benefits. (R. 16 I-17).

The ALJ found Plaintiff insured for DIB only through June 30, 2006, and that she did not engage in substantial gainful activity between her amended alleged onset date and

---

[1]Plaintiff later protectively filed additional applications for DIB and SSI on November 27, 2007. (R. 134-48). The ALJ consolidated the applications and decided all of them in the decision at issue here. (R. 16 I).

[2]Plaintiff amended her alleged onset date to November 1, 2003 at both hearings before the ALJ. (R. 16 I, 2000, 2013).

the decision date.  (R. 16 Z).  He determined that Plaintiff has the following severe impairments:  major depressive disorder, anxiety disorder, history of post-traumatic stress disorder (PTSD), history of attention deficit hyperactivity disorder (ADHD), fibromyalgia, migraines, and a history of Lyme disease; but that her impairments, singly or in combination, do not meet or equal any impairment listed in the Listing of Impairments.  Id.

With regard to Plaintiff's alleged cognitive disorder, the ALJ "noted that although claimant has alleged significant cognitive deficits, she articulated well and was appropriately responsive to questioning at the hearing.  Additionally, she has been able to complete the disability forms appropriately and in a very detailed fashion, with no assistance noted."  (R. 16 N)(citing Exs. 3-E, 6-E, 23-E (R. 195, 212-19, 289-96)).  He specifically considered Plaintiff's argument that her condition meets Listing 12.02 – Organic Mental Disorder, and concluded it does not because it does not meet the criteria of Paragraphs "A," "B," or "C" of the Listing.  (R. 16 J).

The ALJ found the allegations of Plaintiff and her mother regarding the symptoms resulting from Plaintiff's impairments are "not credible or supported by the totality of the evidence."  (R. 16 Z).  He found Plaintiff has the residual functional capacity (RFC) for a range of sedentary work limited to only occasional climbing and balancing; precluding concentrated exposure to cold, heat, humidity, fumes, and odors; and mentally limited to simple, unskilled work, with limited contact with the public.  Id.

In reaching this RFC assessment, the ALJ dedicated approximately eleven pages to summarizing the medical evidence and the medical opinions. (R. 16 N-X). He also stated that he had considered the opinions of the state agency medical consultants and program physicians and psychologists, and accorded them weight "because they are generally consistent with and supported by the findings, opinions, and conclusions of treating and medical sources contained in the record." (R. 16 Y-Z). The ALJ discussed the opinions of eleven named "acceptable medical sources," the opinions of unnamed medical sources treating Plaintiff at Bert Nash Community Mental Health Center, and the opinions of three "'other' medical sources." (R. 16 P-X).

The ALJ determined Plaintiff is unable to perform her past relevant work, but that other jobs of which Plaintiff is capable exist in the economy in significant numbers. (R. 16 Z-17). Consequently, he determined that Plaintiff is not disabled within the meaning of the Act, and denied her applications. (R. 17).

Plaintiff disagreed with the ALJ's second decision and again requested review by the Appeals Council. (R. 16 E). The Council found no reason for review, and denied Plaintiff's request. (R. 16 A-C). Therefore, the ALJ's decision is the final decision of the Commissioner. (R. 16 A); Blea v. Barnhart, 466 F.3d 903, 908 (10th Cir. 2006). Plaintiff now seeks judicial review.

## II. Legal Standard

The court's review is guided by the Act. 42 U.S.C. §§ 405(g), 1383(c)(3). Section 405(g) provides, "The findings of the Commissioner as to any fact, if supported by

substantial evidence, shall be conclusive."  The court must determine whether the factual

findings are supported by substantial evidence in the record and whether the ALJ applied

the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); White v.

Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than a

scintilla, but less than a preponderance, and it is such evidence as a reasonable mind

might accept to support a conclusion.  Zoltanski v. F.A.A., 372 F.3d 1195, 1200 (10th

Cir. 2004); Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).  The court may

"neither reweigh the evidence nor substitute [its] judgment for that of the agency."

White, 287 F.3d at 905 (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d

799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir.

2005).  The determination of whether substantial evidence supports the Commissioner's

decision, however, is not simply a quantitative exercise, for evidence is not substantial if

it is overwhelmed by other evidence or if it constitutes mere conclusion.  Gossett, 862

F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

An individual is under a disability only if that individual can establish that she has

a physical or mental impairment which prevents her from engaging in substantial gainful

activity and is expected to result in death or to last for a continuous period of at least

twelve months.  42 U.S.C. § 423(d).  The claimant's impairments must be of such

severity that she is not only unable to perform her past relevant work, but cannot,

considering her age, education, and work experience, engage in any other substantial

gainful work existing in the national economy.  Id.

The Commissioner uses a five-step sequential process to evaluate whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920 (2009); Allen v. Barnhart, 357 F.3d 1140, 1142 (10th Cir. 2004); Ray, 865 F.2d at 224. "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has a severe impairment, and whether the severity of her impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1). Id. at 750-51. If a claimant's impairments do not meet or equal a listed impairment, the Commissioner assesses her RFC. 20 C.F.R. §§ 404.1520(e), 416.920(e). This assessment is used at both step four and step five of the sequential process. Id.

After assessing claimant's RFC, the Commissioner evaluates steps four and five-- whether claimant can perform past relevant work, and whether, when considering vocational factors of age, education, and work experience, she is able to perform other work in the economy. Williams, 844 F.2d at 751. In steps one through four the burden is on claimant to prove a disability that prevents performance of past relevant work. Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2. At step five, the burden shifts to the Commissioner to show jobs in the national economy within Plaintiff's capacity. Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

Plaintiff claims the ALJ erred in evaluating her cognitive disorder, both in failing to find it is severe at step two, and in failing to find it meets or medically equals the severity of Listing 12.02 at step three of the evaluation process. (Pl. Br. 31-37). She also claims the ALJ erred in evaluating the medical opinion evidence, and the case should be reversed for an immediate award of benefits. Id. at 37-43, 44-45. The Commissioner argues that the ALJ properly found Plaintiff's cognitive disorder is not severe because it has no more than a minimal effect on her ability to perform basic work activities, and properly found it does not meet or equal a Listed Impairment because Plaintiff has not shown that her condition meets the criteria of either Paragraph "A," "B," or "C" of Listing 12.02. (Comm'r Br. 4-16). Finally, he argues that the ALJ properly weighed the medical opinions. Id. at 13-20. The court finds the ALJ's erroneous evaluation of the opinions of the health care providers is dispositive in this case, and discusses the ALJ's treatment of Plaintiff's cognitive disorder only as it directly relates to the analysis regarding medical source opinions.

## III. Evaluation of Health Care Provider Opinions

As discussed above, Plaintiff claims the ALJ erred in evaluating the medical opinion evidence, whereas the Commissioner argues that "the ALJ gave adequate reasons for discrediting Plaintiff's treating physicians' opinions, and the ALJ's RFC finding was based on substantial evidence in the record as a whole." (Comm'r Br. 20).

### A. Standard for Evaluating Health Care Provider Opinions

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  Such opinions may not be ignored and, unless a treating source[3] opinion is given controlling weight, <u>any</u> medical opinion will be evaluated by the Commissioner in accordance with factors contained in the regulations. <u>Id.</u> §§ 404.1527(d), 416.927(d); <u>Soc. Sec. Ruling</u> (SSR) 96-5p, West's Soc. Sec. Reporting Serv., Rulings 123-24 (Supp. 2010).  A physician who has treated a patient frequently over an extended period of time (a treating source) is expected to have greater insight into the patient's medical condition, and his opinion is generally entitled to "particular weight."  <u>Doyal v. Barnhart</u>, 331 F.3d 758, 762 (10th Cir. 2003).  But, "the opinion of an examining physician [(a nontreating source)] who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion."  <u>Id.</u> at 763 (citing <u>Reid v. Chater</u>, 71 F.3d 372, 374 (10th Cir. 1995)).  However, opinions of nontreating(examining) sources are generally given more weight than the opinions of nonexamining sources who have merely reviewed the medical record.

---

[3]The regulations define three types of "acceptable medical sources:"

"Treating source:"  an "acceptable medical source" who has provided the claimant with medical treatment or evaluation in an ongoing treatment relationship.  20 C.F.R. §§ 404.1502, 416.902.

"Nontreating source:"  an "acceptable medical source" who has examined the claimant, but never had a treatment relationship.  <u>Id.</u>

"Nonexamining source:"  an "acceptable medical source" who has not examined the claimant, but provides a medical opinion.  <u>Id.</u>

Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir. 1987) (citing Broadbent v. Harris, 698 F.2d 407, 412 (10th Cir. 1983), Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982), and Wier ex rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984)).

In accordance with the regulations, the term "acceptable medical source" includes only certain named classes of professionals:  licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  20 C.F.R. §§ 404.1513(a), 416.913(a).  Nurses, nurse-practitioners, and therapists are among another group of health care providers called "other" medical sources[4] from whom the Commissioner will accept and use evidence showing the severity of a claimant's impairment(s) and how the impairment(s) affects claimant's ability to work.  Id. §§ 404.1513(d)(1), 416.913(d)(1).  A "treating source," "nontreating source," or "nonexamining source" must be an "acceptable medical source," id. §§ 404.1502, 416.902, and a medical opinion from a "treating source" may be given controlling weight in certain circumstances.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

"If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) [(1)] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and [(2)] is not inconsistent with the other substantial evidence in [claimant's] case record, [the

_____

[4]"Medical sources refers to acceptable medical sources, or other health care providers who are not acceptable medical sources."  20 C.F.R. §§ 404.1502, 416.902.

Commissioner] will give it controlling weight." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also, SSR 96-2p, West's Soc. Sec. Reporting Serv., Rulings 111-15 (Supp. 2010)("Giving Controlling Weight to Treating Source Medical Opinions").

The Tenth Circuit has explained the nature of the inquiry regarding a treating source's medical opinion. Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003). The ALJ determines "whether the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.'" Id. at 1300 (quoting SSR 96-2p). If the opinion is well-supported, the ALJ must determine whether the opinion is not inconsistent with other substantial evidence in the record. Id. (citing SSR 96-2p). "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

If the treating source opinion is not given controlling weight, the inquiry does not end. Id. A treating source opinion is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." Id. Those factors are: (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. Id. at 1301; 20 C.F.R. §§ 404.1527(d)(2-6), 416.927(d)(2-6);

accord, <u>Drapeau v. Massanari</u>, 255 F.3d 1211, 1213 (10th Cir. 2001) (citing <u>Goatcher v. Dep't of Health & Human Servs.</u>, 52 F.3d 288, 290 (10th Cir. 1995)).

After considering the regulatory factors, the ALJ must give reasons in the decision for the weight he gives the treating source opinion.  <u>Id.</u> 350 F.3d at 1301.  "Finally, if the ALJ rejects the opinion completely, he must then give 'specific, legitimate reasons' for doing so."  <u>Id.</u>  (citing <u>Miller v. Chater</u>, 99 F.3d 972, 976 (10th Cir. 1996) (quoting <u>Frey v. Bowen</u>, 816 F.2d 508, 513 (10th Cir. 1987)).

A nurse, a nurse-practitioner, or a therapist who provides treatment for a claimant is an "other" medical source, not an "acceptable medical source" or a "treating source." 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1).  An opinion from an "other" medical source is not, strictly speaking, a "medical opinion," and is never entitled to controlling weight.

Recognizing the reality that an increasing number of claimants have their medical care provided by health care providers who are not "acceptable medical sources"--nurse-practitioners, physician's assistants, social workers, and therapists--the Commissioner promulgated SSR 06-3p.  West's Soc. Sec. Reporting Serv., Rulings 327-34 (Supp. 2010).  In that ruling, the Commissioner noted:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.  Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as

impairment severity and functional effects, along with the other relevant evidence in the file.

Id., Rulings, 330-31.

SSR 06-3p explains that where no treating source opinion is given controlling weight, opinions of "other" medical sources will be evaluated using the regulatory factors for evaluating medical opinions as cited above.  Id. at 331-32(citing 20 C.F.R. §§ 404.1527, 416.927).  The Commissioner recognized that "depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source."  Id. at 332.  The ruling explains that the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  Id. at 333; see also, Frantz v. Astrue, 509 F.3d 1299, 1300 (10th Cir. 2007)(remanding for consideration of a nurse-practitioner's opinions in light of SSR 06-3p).

**B.      The ALJ's Decision**

As discussed above, the ALJ summarized the medical evidence and the health care provider opinions.  (R. 16 N-X).  He considered the opinions of the state agency medical consultants and program physicians and psychologists.  (R. 16 Y).  The ALJ specifically

discussed the opinions of eleven named "acceptable medical sources;" the opinions of unnamed medical sources treating Plaintiff at Bert Nash Community Mental Health Center; and the opinions of three "'other' medical sources:" a registered nurse, a therapist, and a nurse-practitioner.  (R. 16 P-X).

The ALJ summarized medical evidence provided by numerous health care providers, including:  Dr. Ragsdale, Dr. Ramirez, Dr. Lawrence, Dr. Mintz, Internal Medicine Group, Dr. Duncan, Dr. McCartan, Dr. Malik, Dr. J. Martinez,[5] Dr. Baptist, Dr. Penn, Dr. Verstraete, Dr. Ryser, BlueBonnet Trails Community Mental Health Center, Bert Nash Community Mental Health Center, Family Resource Team, nurse Ms. Morris, Dr. Barnett, therapist Ms. Renelli, ARNP Mr. Hogan, Dr. Dickie, and psychiatric hospitalization records from Shawnee Mission Medical Center.  (R. 16 N-X).

The ALJ noted Dr. Baptist's opinion that Plaintiff had a "less than sedentary" RFC, that she would "miss work 'more than three times a month,'" and had "an 'extreme' limitation in many areas of mental functioning."  (R. 16 P).  He noted Dr. Penn's opinions that Plaintiff had "significant difficulty in answering questions, suggesting a cognitive impairment," and "an 'extreme' limitation in deficiencies of concentration;" was incapable

_____

[5]The court notes that the ALJ also mistakenly called Dr. Ramirez, "Dr. Martinez" twice in his decision.  (R. 16 N, 16 R).  This error is particularly confusing because, as the ALJ noted, Plaintiff was treated by Dr. John Martinez, and Dr. John Martinez prescribed a course of physical therapy for Plaintiff (R. 16 O, 1528) and submitted a Functional Capacity Questionnaire (R. 1639-43) to which the ALJ accorded no weight.  (R. 16 Q).  In this opinion, the court consistently refers to "Dr. Ramirez" or to "Dr. J. Martinez," as appropriate, even where the ALJ mistakenly used "Dr. Martinez" when referring to Dr. Ramirez.

of even low stress jobs; had a "less than sedentary" RFC; and was "likely to miss work 'more than four days a month.'" Id.  The ALJ noted Dr. Verstraete's opinion that Plaintiff had a "less than sedentary" RFC, and "would likely miss work 'more than four days per month.'" (R. 16 Q).  He noted Dr. Ryser's opinion that Plaintiff had a "less than sedentary" RFC, and "limitations that would preclude any kind of gainful employment." Id.  He assessed the medical opinions of these treating sources, Dr. Baptist, Dr. Penn, Dr. Verstraete, and Dr. Ryser, together in a single paragraph, and accorded them "little weight" because (1) the opinions "are not consistent with the totality of the medical evidence, i.e., the [(a)] treatment notes and physical examination and diagnostic findings of record, as well as [(b)] claimant's demonstrated level of functioning;" because (2) the physicians rendered an opinion on the ultimate issue of disability; and because (3) Dr. Baptist's opinion on mental functioning is outside of his medical expertise.  Id.

The ALJ gave no weight to Dr. J. Martinez's opinion because Dr. J. Martinez (1) reported no objective abnormalities on examinations or diagnostic and laboratory testing, (2) noted he was not qualified to assess mental limitations, and (3) marked most of the questions regarding physical limitations and employability, "I don't know."  Id.

The ALJ noted that Dr. McCartan found "'moderate' cognitive impairments," and stated that Plaintiff's symptoms "were consistent with those seen in traumatic brain injury, but her history of ADD [(attention deficit disorder)] could also be a contributing factor."  (R. 16 S).  However, he neither rejected the opinion nor assigned a particular weight to it.

The ALJ summarized a neuorpsychological assessment performed by Dr. Ramirez in January 2004. (R. 16 Q-R). Dr. Ramirez noted some indications of brain damage in both hemispheres, a need for a job coach, and a presentation that was variable--expressing herself well, but being a bit impulsive at times. (R. 16 R). The ALJ noted Dr. Ramirez's opinion that Plaintiff had a GAF[6] score of 55, characterized by Dr. Ramirez as "moderate to serious symptoms," that Plaintiff would need an environment which was not very anxiety-producing, that her working memory was fairly good but she would not be able to remember names very well, that she had problems with memory but with some carry-over for new learning, and that judgment may be slightly impaired. Id.

The ALJ also summarized a report by Dr. Lawrence to whom Plaintiff had been referred because of the doctor's background in neuropsychology.[7] (R. 16 T-U). The ALJ

_____

[6]Global Assessment of Functioning. A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-IV-TR) 32 (4th ed., text revision 2000). The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). Id. at 34. GAF is a classification system providing objective evidence of a degree of mental impairment. Birnell v. Apfel, 45 F. Supp. 2d 826, 835-36 (D. Kan. 1999) (citing Schmidt v. Callahan, 995 F. Supp. 869, 886, n.13 (N.D. Ill. 1998)).
GAF scores in the range of 51-60 indicate "**Moderate symptoms** . . . **OR moderate difficulty in social, occupational, or school functioning.**" DSM-IV-TR, at 34(emphasis in original).

[7]The ALJ stated this was a background in "neuron-psychology" (R. 16 T), but Dr. Lawrence stated Plaintiff "was transferred to me in early February 2005, due to my background in neuropsychology . . ." (R. 811).

noted Dr. Lawrence's statements that Plaintiff's presentation was consistent with Dr. Ramirez's report; that Plaintiff took notes but returned to the next session having forgotten the majority of what was covered; and that Plaintiff would be unable "to sustain competitive employment for at least the next year (and likely much longer)," but that in the future she would "likely benefit from part-time supported employment services." (R. 16 T). The ALJ stated there were no detailed mental status examinations or clear clinical findings in Dr. Lawrence's treatment notes for February and March 2005. Id. He noted that Dr. Lawrence also provided opinions in December 2006, August 2007, and February 2008, in which she assessed Plaintiff with "very significant mental limitations" in many areas of mental functioning, and assessed Plaintiff with a GAF score of 45,[8] indicating serious mental symptoms. (R. 16 T).

The ALJ accorded "little weight" to Dr. Lawrence's opinion. Id. at 16 U. The ALJ stated his reasons for according "little weight" to the opinion: (1) It "is not consistent with the totality of the medical evidence." (R. 16 T). (2) It relies heavily upon Dr. Ramirez's findings. Id. (3) It is inconsistent with "the essentially benign mental status examination findings of record and diagnostic testing showing no evidence of brain abnormalities for claimant." Id.(citing Ex. 33-F(R. 773-801)). (4) Dr. Lawrence's March 2005 opinion was formulated after only two months of treatment during which the

---

[8]GAF scores in the range of 41-50 indicate "**Serious symptoms . . . OR any serious impairment in social, occupational, or school functioning**." DSM-IV-TR at 34(emphasis in original).

treatment notes show only minimal mental health findings and no detailed mental status examination findings.  Id. at 16 T-U(citing Ex. 35-F, pp. 2-4(R. 812-14)).  (5) The opinion of non-employability is inconsistent with record evidence of part-time employment during the period.  Id. at 16 U.  (6) The opinion is inconsistent with Plaintiff's demonstrated level of performance.  Id.  And, (7) the opinion of disability and inability to work relates to determination of issues reserved to the Commissioner.  Id.

Although the ALJ did not assign weight to Dr. Ramirez's opinion, a fair reading of the decision reveals he accorded "little weight" to it.  The ALJ discounted Dr. Lawrence's opinion, in part, because she relied upon Dr. Ramirez's report in which "there were some discrepancies in the report regarding education."  (R. 16 T).  This statement is apparently based upon the ALJ's earlier discussion regarding Plaintiff's credibility, in which he noted inconsistencies in Plaintiff's reports to medical care providers regarding her educational background:

> At the psychological evaluation with Dr. Ragsdale in March 2002, claimant reported that she had attended school through the 11th grade and later earned a GED approximately 2 years previously, or in the year 2000. Claimant reportedly had not participated in any special education as a younger child or as an adolescent.  It was also noted then that claimant had approximately 70 college credits, with a GPA of 3.6.  Claimant also reported to Dr. Ragsdale in March 2002 that she was, at that time, attending classes at San Juan College in Farmington, New Mexico, and was previously taking classes at Fort Lewis in Durango (Exhibit 6-F, pages 2 and 3).  However, when claimant was seen for a neuropsychological assessment in January 2004 by Dr. Manuel Ramirez, she reported that she had only an 11th grade education with no special education classes, and later obtained a GED (Exhibit l9-F, page 3).  It is noted that Dr. Sandra Lawrence, in making her overall assessment and opinion of claimant's mental condition and cognitive functioning, specifically cited the January

2004 neuropsychological assessment by Dr. Martinez as a basis for her conclusions (Exhibit 35-F, page 1), which as noted, showed claimant to have only a GED education. It is also noted that when claimant was seen for an evaluation with Dr. Nicole McCartan on January 21, 2005, to evaluate Claimant's complaints of confusion and memory and concentration deficits, claimant reported then that she had only an 11th grade education and a GED obtained later (Exhibit 33-F, page 4). No college education or GPA was mentioned as it was to Dr. Ragsdale in March 2002 (Exhibit 6-F, pages 2 and 3).

(R. 16 M-N).

The ALJ noted a report from Dr. Dickie, who had treated Plaintiff every two to four weeks, but only between November 2007, and March 2008. (R. 16 V). He noted that Dr. Dickie "assessed some very significant physical and mental limitations." Id. He accorded "little weight" to Dr. Dickie's report because: (1) It "is not consistent with the totality of the evidence, i.e., [(a)] the medical treatment records and [(b)] claimant's demonstrated level of functioning during the period at issue;" (2) Dr. Dickie treated Plaintiff only four months before making his assessment; and (3) the report renders an opinion on issues (disability and inability to work) which are reserved to the Commissioner. (R. 16 V-W).

The ALJ also summarized opinions from three "other" medical sources: a nurse, Ms. Morris; a therapist, Ms. Renelli; and a nurse-practitioner, Mr. Hogan. (R. 16 S, 16 U-V). He noted Ms. Morris's opinion that Plaintiff had cognitive, behavioral, memory, and emotional deficits caused by a motor vehicle accident; and her cognitive deficits demonstrated moderate problems. (R. 16 S). He noted Ms. Renelli's opinion that Plaintiff's mental disorders "were likely to be chronic and debilitating." (R. 16 U). He

noted that Mr. Hogan assessed Plaintiff with "some very significant (marked) limitations" in mental functioning and opined that Plaintiff "would likely be absent from work 'more than four days per month.'" (R. 16 V).

The ALJ gave Ms. Morris's opinion "little weight" because she is an "other source," not an "acceptable medical source," but he stated that "the information Ms. Morris offered is reasonably consistent with other evidence in the file, i.e. that claimant has minimal problems with meal preparation and management of her medications, and mild to moderate problems with shopping, transportation, laundry and housekeeping, with moderate difficulties in attention, concentration, learning and memory." (R. 16 S). The ALJ considered the opinions of Ms. Renelli and Mr. Hogan together, and accorded them "little weight" (1) because Ms. Renelli and Mr. Hogan are "other sources," not "acceptable medical sources;" and (2) because the opinions "are not consistent with the totality of the medical evidence, [(a)] the inconsistencies in the record and [(b)] claimant's demonstrated level of functioning during the period at issue. (R. 16 V).

The ALJ noted treatment records from 2004 through 2009 at Bert Nash Community Mental Health Center. (R. 16 R-S, U, V, W, X). He noted that GAF scores of 45 and 50 had been assigned at Bert Nash on several occasions. (R. 16 U, V). But, he stated that the Bert Nash "records show no clear clinical findings and no detailed mental status examinations" (R. 16 U), "minimal mental health findings and no clear clinical findings or detailed mental status examinations" (R. 16 V), "no clear clinical findings and no detailed mental status examinations" (R. 16 W), and "minimal mental health findings."

(R. 16 X). He concluded that although the Bert Nash records showed low GAF scores and limitations which would preclude all competitive employment, he would accord "little weight" to these opinions because, "their overall findings are not supported by the totality of the evidence, including their own treatment notes." (R. 16 X).

The ALJ also noted reports by two consultant psychologists, Dr. Mintz, and Dr. Barnett. (R. 16 N, W). He noted Dr. Mintz's report that Plaintiff's performance and scores on TOMM testing were suggestive of malingering (R. 16 N, W), and stated that the suggestion of malingering would reduce the credibility and impact of other psychological testing scores by Dr. Mintz which placed Plaintiff in the borderline range of intellectual functioning. (R. 16 N). Although the ALJ did not assign a particular weight to Dr. Mintz's report, it is clear he accepted without reservation the suggestion of malingering.

The ALJ noted the report of Dr. Barnett, that although Plaintiff is "organically cognitively impaired in a manner that would interfere with some types of employment, [Dr. Barnett] observed no difficulty with inattention during the evaluation and claimant appeared cognitively capable of simple repetitive work tasks, but not complex tasks." (R. 16 W). The ALJ stated he:

> is in agreement with the findings of Dr. Barnett in that despite her impairments, claimant would be able to perform at least simple, repetitive work. The evidence as a whole does not establish any significant cognitive disorder for claimant that would prevent her from performing this type of work. As previously noted, at the psychological evaluation with Dr. Ragsdale in March 2002, claimant reported that she had attended school through the 11th grade and later earned a GED approximately 2 years previously, or in the year 2000. Claimant reportedly had not participated in any special education as a younger child or as an adolescent. It was also

noted then that claimant had approximately 70 college credits, with a GPA
of 3.6. Claimant also reported to Dr. Ragsdale in March 2002 that she was,
at that time, attending classes at San Juan College in Farmington, New
Mexico, and was previously taking classes at Fort Lewis in Durango
(Exhibit 6-F, pages 2 and 3).

The record, overall, points to discrepancies with respect to claimant's
education and work activity during the period at issue, as previously
discussed. Moreover, claimant's credibility has come under question with
respect to the IQ testing by Dr. Mintz in June 2008 (Exhibit 76-F). Dr.
Mintz noted at that time that claimant's performance and scores on TOMM
testing were suggestive of malingering.

(R. 16 W).

Later, the ALJ again discussed the "totality of the evidence:"

The undersigned, overall, finds that the totality of the evidence does not
establish that claimant has borderline intellectual functioning or a cognitive
disorder. It appears that claimant has 11 years of formal education with a
high school equivalency of a GED in addition to at least 70 college credits.
According to claimant, she has also been certified as a massage therapist
and has gone to school for floral arrangement. Additionally and as noted,
claimant articulated well and was appropriately responsive to questioning at
the hearing. Additionally, she has been able to complete the disability
forms appropriately and in a very detailed fashion, with no assistance noted
(Exhibits 3-E, 6-E and 23-E). She has a valid driver's license and does
drive; and, she is able to care for her young child. Although claimant
testified to no work activity after 2003, earnings queries and some of the
treatment records point to her continuing part-time work as a florist during
the period at issue.

(R. 16 W-X).

Finally, the ALJ stated he had considered the "findings, opinions, and assessments

of the non-examining State agency consultants and program physicians and

psychologists, . . . and has accorded them weight . . . because they are generally

consistent with and supported by the findings, opinions, and conclusions of treating and medical sources contained in the record."  (R. 16 Y-Z).

### C.    Analysis

As a preliminary matter, the court finds substantial evidence supports the ALJ's finding that Dr. J. Martinez's Functional Capacity Questionnaire should be accorded no weight for the reasons stated in the ALJ's decision.  Moreover, Plaintiff does not argue otherwise.

However, as summarized above, the ALJ noted reports of twelve health care providers other than Dr. J. Martinez who provided treatment for Plaintiff and stated limitations on Plaintiff's capabilities which, if accepted, require a finding that Plaintiff is disabled.  The ALJ accorded "little weight" to each of these opinions, and as to nine of the providers, did so at least in part, because the opinion was not consistent with the "totality of the evidence."

A fair reading of the decision reveals that the ALJ's use of the phrase "totality of the evidence" or "totality of the medical evidence" includes (a) the treatment notes, examination findings, and diagnostic findings of record; and (b) Plaintiff's demonstrated level of functioning, represented by her completion of seventy credit hours of college level work with a GPA (grade point average--presumably on a 4.0 scale) of 3.6, part-time work after her amended alleged onset date of November 1 2003, and her alleged ability to care for herself and her young child.  The court finds substantial evidence on the record as

a whole does not support the ALJ's finding that "the totality of the evidence" is inconsistent with the opinions of the treating health care providers.

Although the ALJ cites treatment notes, examination findings, and diagnostic findings in the record which are characterized as "normal," "unremarkable," or "relatively benign," he cites no treating health care provider who concluded based upon these findings that Plaintiff is able to work day-in and day-out on a sustained basis. To the contrary, he documented twelve health care providers who, based upon these inconclusive findings and upon the providers' treatment, experience, and clinical analysis, determined that Plaintiff has limitations which, if accepted, require a finding that Plaintiff is disabled within the meaning of the Act.

The only examining medical source who opined Plaintiff could work was Dr. Barnett, who acknowledged Plaintiff is "organically cognitively impaired in a manner that would interfere with some types of employment," but opined that she "appears cognitively capable of simple, repetitive work tasks, but not complex tasks." (R. 1697)(emphasis added). This opinion says nothing of Plaintiff's ability to work day-in, day-out, on a sustained basis. Dr. Barnett based his opinion on a single mental status examination, and an interview with Plaintiff. (R. 1695-97). He did no psychological testing, and there is no indication that he was given any of Plaintiff's medical records to review prior to the examination. It is extremely unlikely that he was provided, much less that he reviewed, the nine-hundred-plus pages of medical records, or even the more-than-two-hundred pages of psychological or psychiatric medical records in this case.

The treating health care providers each had access to his or her own treatment records, examination results, and diagnostic testing results, and was familiar with Plaintiff's condition and his own treatment of Plaintiff when he stated the opinion which the ALJ found not to be supported by the treatment notes, examination findings, and diagnostic findings. The record simply does not provide a basis to assert that the health care providers erred in their evaluation of Plaintiff, of the treatment records, of the examination results, or of the diagnostic findings. Yet, that is in essence what the ALJ has done. In this case, the ALJ cites no medical opinion that the record medical evidence does not support the opinions of the health care providers. The ALJ did not even call a medical expert to testify at the hearings who might proffer such an opinion, and/or might explain what in the medical evidence precludes or is contrary to the opinions of the treating health care providers. It is well established in this Circuit that an ALJ may not prefer his own lay opinion over that of a health care provider. McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002)(ALJ may not reject a treating physician's opinion "due to his or her own credibility judgments, speculation or lay opinion.")(emphasis in original); Winfrey v. Chater, 92 F.3d 1017, 1022-23 (10th Cir. 1996)(may not substitute his medical judgment for that of a medical source, or second-guess a medical expert's judgment); Kemp v. Bowen, 816 F.2d 1469, 1476 (10th Cir. 1987)("can not interpose his own 'medical expertise' over that of a physician").

The ALJ also found that the health care providers' opinions were inconsistent with Plaintiff's demonstrated level of functioning--completion of seventy credit hours of

college level work with a GPA of 3.6, part-time work after her amended alleged onset date of November 1 2003, and her alleged ability to care for herself and her young child. The record does not support this finding.[9]

First, the ALJ's finding with regard to part-time work will not support his decision to discount the treating health care providers' opinions. The ALJ found earnings of $191.10 in 2004, and $410.16 in 2005, and noted plaintiff's September 2007 report that she was cleaning houses, her January 2008 report that she was working part-time as a florist, and evidence that she was "called upon for special days such as Valentine's Day," to fill in as a florist. (R. 16 M). The ALJ found that Plaintiff "has not engaged in substantial gainful activity since the amended alleged onset date of November 1, 2003," and that she "is unable to perform her past relevant light work of floral arranger, albeit the record reflects that she has performed this work on a part-time basis during the period at issue." (R. 16 Z).

Plaintiff reported, variously, that she made $9.25 (R. 188), $8.50 (R. 213, 224), and $6.00 (R. 289) per hour as a floral designer, and $9.00 per hour doing light housekeeping. Therefore, even assuming she made $6.00 per hour at both jobs in 2004 and 2005, she worked a total of less than thirty-two hours in 2004, and less than sixty-

_____

[9]The ALJ relied, in part, upon his findings regarding education, part-time work, and ability to care for herself and her young child, in finding Plaintiff's allegations of symptoms are not credible. (R. 16 L-M). As the court's discussion will demonstrate, it is by no means certain that the ALJ's credibility findings are supported by the substantial evidence in the record. Nonetheless, Plaintiff did not allege error in the credibility findings, and the court does not address that issue.

nine hours in 2005.  Moreover, a "Detailed Earnings Query" dated March 24, 2009 reflects no reported income in 2006-2009.  (R. 173).  There is simply nothing in the record from which it can be inferred that plaintiff worked after November 1, 2003 on anything more than a sporadic, ad hoc, or occasional basis.  Such work activity is not inconsistent with the treating health care providers' opinions, either that Plaintiff must miss work three or four days a month, or that she cannot work on a day-in, day-out basis.

That Plaintiff was able to complete some college-level education before her amended alleged onset date (November, 2003), or was allegedly able to care for herself and her young child, is likewise not inconsistent with the health care providers' opinions in the circumstances of this case.  As the ALJ noted, Plaintiff reported to Dr. Ragsdale on March 1, 2002 that she had earned a GED approximately two years earlier, and had since completed approximately seventy college credits at Fort Lewis and at San Juan College with a GPA of 3.6.  (R. 16 N)(citing Ex. 6-F, pp.2-3(R. 432-33)).

The ALJ did not acknowledge Dr. Ragsdale's other reports that Plaintiff's scores on the Trail-Making Test fell within an impaired range, that her working-memory index score fell within an impaired or borderline range, and that a learning disability was suggested by the significant discrepancy between her IQ percentile scores and her academic level of performance percentile scores.  (R. 433-35).  Dr. Ragsdale specifically noted that ADHD as well as difficulty with verbal/written expressive abilities was suggested.  (R. 435).  He concluded, "Without accommodations being made, it is unlikely

that Tamara will be able to continue to be successful in her academic pursuits in college." (R. 435). The ALJ did not discuss this opinion or assign it any weight.

As Plaintiff points out, her educational achievements which were relied upon by the ALJ to discount the opinions of the treating health care providers all occurred before her amended alleged onset date, and are irrelevant to the providers' opinions regarding disabling limitations thereafter. Moreover, in light of Dr. Ragsdale's opinion, the short-term educational accomplishments achieved are not inconsistent with the providers' opinions.

Further, the ALJ acknowledged the Plaintiff's mother sees her about three times a week, and when she is ill, helps with dishes and laundry, goes grocery shopping with her, and helps care for Plaintiff's son. (R. 16 K). What he did not state was that Plaintiff's mother testified that she sees Plaintiff an average of four to six hours, three times a week. (R. 2026). When asked what she did at her daughter's house, the mother testified, "A lot of times, dishes and laundry. We'll sometimes do the grocery shopping. Watch Logan <u>many times and help with him</u>. <u>Sometimes</u> we just get to visit." <u>Id.</u>(emphases added). She testified that she stays longer, sometimes overnight, when Plaintiff is "having one of her spells." <u>Id.</u> She testified in such cases "I try to entertain Logan, and we try to do stuff maybe outdoors just to give her some time." (R. 2027). When asked how often these spells occur, she testified, "Sometimes she might go for a week or so without having one. And then maybe she'll have one two or three times in a row. One of the last ones I remember, it was three days long, and that was quite long." (R. 2027). She clarified,

"Normally it's a day or two." Id. Thus, the evidence is not unequivocal that Plaintiff is able to care for herself and her young child. There is evidence that Plaintiff has considerable help, averaging four to six hours, three days a week, and more when she is having a "spell." This evidence is not inconsistent with the health care providers' opinions, either that Plaintiff must miss work three or four days a month, or that she cannot work on a day-in, day-out basis. In fact, this evidence supports the health care providers' opinions.

Although the ALJ did not assign a particular weight to Dr. McCartan's opinion that Plaintiff has "moderate" cognitive impairments which are consistent with those seen in traumatic brain injury, that opinion is simply one more opinion which tends to add weight to the opinions of the other health care providers.

With regard to the ALJ's additional reasons to discount Dr. Lawrence's opinion, the court finds some of them are not supported by substantial evidence in the record. The ALJ discounted Dr. Ramirez's opinion because of "some discrepancies in the report regarding education" (R. 16 T), but as discussed above those "discrepancies" do not justify rejecting the opinion. Therefore, the ALJ's decision to discount Dr. Lawrence's opinion because it relied upon Dr. Ramirez's opinion is left unsupported as well. Further, as Plaintiff points out, Dr. Lawrence is an expert in neuropsychology, and although she noted her opinion is consistent with Dr. Ramirez's report, she also based her findings upon her own evaluation and treatment. (R. 811). Although as the ALJ noted, Dr. Lawrence's March 2005 opinion was formulated after only two months of treatment, Dr.

Lawrence was with the Bert Nash Community Mental Health Center which began treating Plaintiff at least by 2004, and Plaintiff's care was transferred within Bert Nash to Dr. Lawrence in February 2005 because of Dr. Lawrence's expertise. (R. 811). Based upon this scenario, it must be assumed that Dr. Lawrence's opinion was based at least in part on a review of the earlier Bert Nash records. Moreover, the ALJ acknowledged that Dr. Lawrence provided opinions in December 2006, August 2007, and February 2008 which were consistent with her earlier opinion and were based upon ever-lengthening treatment. This fact seriously undermines the ALJ's implying that Dr. Lawrence's opinion was based only on a short treatment relationship.

The health care providers opinions which were discounted by the ALJ simply <u>are not</u> inconsistent with the "totality of the evidence." In fact, they are substantially supported by the totality of the evidence as discussed above. One might even say that through accumulation they have <u>become</u> the "totality of the medical evidence."

The ALJ purported to rely upon the opinion of Dr. Mintz regarding TOMM scores in discounting the opinions of the treating health care providers, but he appears to have rejected the other psychological testing scores provided by Dr. Mintz because the TOMM scores were suggestive of malingering. (R. 16 N, W). Dr. Mintz's testing revealed IQ scores in the low seventies, and Trails A and B testing suggestive of moderate visual/spatial cognitive impairment. (R. 1713-14). On the TOMM test, Dr. Mintz reported Plaintiff's Trial 1 score "is not suggestive of malingering," but that her scores on Trial 2 and on the Retention Trial of the TOMM are suggestive of malingering. (R.

1715). Dr. Mintz summarized his results without stating how the TOMM scores affected

his interpretation of the other testing results:

> Ms. Tamara Farmer noted she has related fairly well to co-workers and
> supervisors previously. She appears able to understand simple and
> intermediate instructions. She does note difficulty with memory functions
> and this was also noted in terms of her memory scores. There were
> suggestions of malingering as noted by her TOMM test results.

(R. 1715). Nonetheless, he diagnosed Plaintiff with "Cognitive Disorder, NOS," and

"Borderline Intellectual Functioning." Id.

Although the report is by no means clear, the court's consideration of the ALJ's

findings is deferential. Because it is reasonable to find that the suggestion of malingering

in Dr. Mintz's report detracts from the validity of Dr. Mintz's other psychological testing,

the court finds no error in the ALJ's evaluation of Dr. Mintz's report individually.

Finally, the ALJ's determination to accord the "findings, opinions, and

assessments of the non-examining State agency consultants and program physicians and

psychologists, . . . weight . . . because they are generally consistent with and supported by

the findings, opinions, and conclusions of treating and medical sources contained in the

record" (R. 16 Y-Z), is not supported by substantial evidence in the record as a whole. As

the court's discussion above reveals, the opinions of the state agency consultants,

program physicians, and psychologists are by no means consistent with or supported by

the "findings, opinions, and conclusions" of the treating health care providers discussed

herein. Moreover, the ALJ cited to no "findings, opinions, and conclusions" of any

treating or other medical source in the record which are consistent with or support the

opinions of the state agency consultants, program physicians, and psychologists. This finding appears to be mere boilerplate, signifying nothing.

The court is left with the fact the Commissioner has not, and based upon the court's review of the record, cannot, properly discount the opinions of the treating health care providers discounted by the ALJ and discussed herein. The record contains the opinions of twelve treating health care providers which, if accepted, require a finding of disability. This is juxtaposed against the opinions of two health care providers who merely examined Plaintiff once each, and whose opinions are stated in equivocal, uncertain terms (results are <u>suggestive</u> of malingering, "appears cognitively capable of simple, repetitive work <u>tasks</u>, but not complex tasks"). Although the court acknowledges that in the appropriate circumstances nontreating sources' opinions may outweigh the opinion of a treating source, these are not such circumstances. The evidence of this record as a whole supports but one conclusion, that Plaintiff is disabled within the meaning of the Act.

## IV. Remand for Immediate Award of Benefits

Plaintiff claims remand for additional fact-finding would serve no purpose and that substantial evidence on the record as a whole establishes that she is disabled within the meaning of the Act. (Pl. Br. 45). The Commissioner did not specifically address this allegation, but argued that the ALJ properly found Plaintiff's cognitive disorder is not severe, properly found that Plaintiff's condition does not meet or equal Listing 12.02, and

properly weighed the medical opinions of record, and articulated adequate reasons for discounting the opinions.

Whether to remand the case for additional fact-finding or for an immediate award of benefits is within the discretion of the court. Ragland v. Shalala, 992 F.2d 1056, 1060 (10th Cir. 1993); Taylor v. Callahan, 969 F. Supp. 664, 673 (D. Kan. 1997) (citing Dixon v. Heckler, 811 F.2d 506, 511 (10th Cir. 1987)). In 2006, the Tenth Circuit noted two factors relevant to whether to remand for an immediate award of benefits: Length of time the matter has been pending and "whether or not 'given the available evidence, remand for additional fact-finding would serve [any] useful purpose but would merely delay the receipt of benefits." Salazar v. Barnhart, 468 F.3d 615, 626 (10th Cir. 2006)(quoting Harris v. Sec'y of Health & Human Servs., 821 F.2d 541, 545 (10th Cir. 1987); and citing Sisco v. Dep't of Health & Human Servs., 10 F.3d 739, 746 (10th Cir. 1993)).

The decision to direct an award of benefits should be made only when the administrative record has been fully developed and when substantial and uncontradicted evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits. Gilliland v. Heckler, 786 F.2d 178, 184, 185 (3rd Cir. 1986). However, the Commissioner is not entitled to adjudicate a case ad infinitum until he correctly applies the proper legal standard and gathers evidence to support his conclusion. Sisco, 10 F.3d at 746.

In this case, all the relevant factors support a decision to remand for an immediate award of benefits. Plaintiff originally applied for benefits on March 8, 2004. While

remand for additional proceedings is not unheard of even after six and one-half years, this case has the added fact that the Appeals Council remanded the case for further proceedings in February 2009, noting that the ALJ had not properly supported his evaluation of Dr. Lawrence's opinion. As discussed above, even after remand, the ALJ failed to properly evaluate the opinions of numerous health care providers, including the medical opinion of Dr. Lawrence. There is no assurance further proceedings would produce a proper evaluation. The time this case has been pending weighs somewhat in favor of remand for award of benefits.

In light of the fact that the opinions of twelve treating health care providers support a finding of disability, it is extremely unlikely that further development of the medical record or further consultative examination will provide evidence which can overcome such weighty authority.

One might argue that the evidence of disability is not uncontradicted because of the contrary findings of the state agency physicians and psychologists, and the equivocal findings of the nontreating consultative examiners. However, as discussed above, the opinions of the consultative examiners are equivocal, and can be viewed as consistent with the findings of the treating sources and the "other" medical sources. As discussed herein, the ALJ erred in weighing the opinions of the state agency physicians and psychologists. Moreover, the opinions of the state agency physicians and psychologists were formulated before the record was fully developed, and without the benefit of the overwhelming weight of opinion of the treating health care providers.

Therefore, the court finds the administrative record has been fully developed and substantial and uncontradicted evidence on the record as a whole indicates that Plaintiff is disabled and entitled to benefits.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is REVERSED and that judgment shall be entered forthwith in accordance with the fourth sentence of 42 U.S.C. § 405(g) REMANDING this case to the Commissioner with instructions to award benefits in accordance with Plaintiff's applications and her amended alleged date of onset of disability.

Copies of this Memorandum and Order shall be delivered to counsel of record for the parties.

Dated this 8<u>th</u> day of September 2010, at Kansas City, Kansas.


s/ John W. Lungstrum
**JOHN W. LUNGSTRUM**
**United States District Judge**